## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

David Allan Loriaux,

               Petitioner,      Case No. 15-cv-13788

v.                            Judith E. Levy
                                United States District Judge

Tony Trierweiler,

                            Mag. Judge Anthony P. Patti
               Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA <u>PAUPERIS</u>

Michigan prisoner David Allan Loriaux ("Petitioner") filed this habeas case under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Wayne County Circuit Court of three counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1)(a), and two counts of second-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520c(1)(a). Petitioner was sentenced to concurrent terms of twenty-five to fifty years imprisonment for the first-degree convictions and five years and eleven months to fifteen years imprisonment for the second-degree convictions. The petition raises two claims: (1) petitioner was denied the effective assistance of counsel where his trial attorney

failed to present evidence that the child victim was previously sexually assaulted by her uncle in order to explain her age-inappropriate knowledge of sex acts, and (2) petitioner was denied the effective assistance of counsel where his trial attorney failed to adequately challenge the credibility of the victim through expert witness testimony. Petitioner's claims are without merit, and the petition will be denied. The Court will also deny petitioner a certificate of appealability and permission to appeal *in forma pauperis*.

## I.    Background

The charges against petitioner stemmed from allegations that he sexually assaulted his step-daughter, who was eight or nine years old when the assaults occurred and ten years old at the time of trial. The matter came to light after the victim returned from visiting her grandmother in Tennessee. Petitioner spent a few hundred dollars on the victim's transportation costs for that trip. The victim's mother found a letter in petitioner's pants pocket asking the victim to perform sex acts in appreciation for sending her on the trip. The letter read as follows:

You know with all the money I spent on you in the past three weeks and how much I have done for you it cost over three hundred dollars just to bring you back.

I ask for one favor and you have made me wait for almost three weeks now for something you promised to give me that weekend.

And then all the extra money I spent on you after that. And you say you love me. With everything I done for you[,] you should be begging me to let you stuck (sic) [suck] my dick.

Everyday you should be looking for the opportunity to show me how much you love me. (suck suck). It has really pissed me off after all I've done for you and your mom.

The least you can do is suck my dick without me having to ask you 50 times or acting like you don't like it because I know you do.

So stop fucking around and do it already. You need to tell my dick how sorry you are that you have made him wait so long.

(Dkt. 6-6 at 176.)

At trial, the victim, herein referred to by her initials EO, testified that she used to live in a trailer with her mother, her baby brother, and petitioner. (*Id*. at 98-104.) Sometimes when her mother was at work petitioner would watch her and her brother. (*Id*. at 105.)

EO testified that the assaults began when she was about eight years old. (*Id*. at 105-06.) On one occasion, petitioner took EO into her bedroom closet and told her that he wanted her to "suck his dick." (*Id*.

3

at 106.) She complied with petitioner's demand, after which something white came out of his penis. (*Id*. at 107-110.) Petitioner wiped the door, but he didn't clean the carpet. (*Id*. at 110.)

EO described other incidents and locations where she was forced to perform oral sex on petitioner. (*Id*. at 110-114.) EO also testified that petitioner would do something he described as "boo be doo" where he would rub his penis between her breasts. (*Id*. at 114-16.)

EO testified that she once visited her grandmother in Tennessee. (*Id*. at 118-120.) When she returned home, petitioner gave her the letter to read. (*Id*. at 119.)

On cross-examination at trial, EO could not remember whether petitioner did inappropriate things to her when they previously lived in an apartment. (*Id*. at 124.) EO also gave inconsistent answers about whether petitioner did anything to her on the day her mother found the letter. (*Id*. at 125-129.) EO admitted that she could remember some incidents well, but she could not remember the details of others because her mind did not want to remember some things. (*Id*. at 131.) EO was unable to give specific dates or times she performed oral sex on petitioner in her bed because it happened a lot. (*Id*. at 141.)

EO's mother, Maria Loriaux, testified that she was with petitioner for about five years. (*Id*. at 155.) She testified that petitioner and EO interacted as a father and daughter. (*Id*. at 156.) EO and petitioner got along well. (*Id*.)

Ms. Loriaux testified that she found the letter in petitioner's pants pocket when she was doing the laundry. (*Id*. at 157.) Ms. Loriaux confronted petitioner with the letter. (*Id*. at 161.) Petitioner said he never touched EO, but he admitted to Ms. Loriaux that he had thoughts about it and so he wrote them down. (*Id*. at 161-62.) Ms. Loriaux testified that petitioner had spent several hundred dollars to send EO down to Tennessee and back shortly before she found the letter. (*Id*. at 162-63.)

After confronting petitioner, Ms. Loriaux asked EO if he had ever touched her, and EO started crying and said that he had. (*Id*. at 162.) EO told Ms. Loriaux about the oral sex, and something called "boo be doo." (*Id*. at 169.) Ms. Loriaux spoke with petitioner's family members and then contacted the police. (*Id*. at 162-63.)

Some time after the police were involved, EO told Ms. Loriaux about the incident in her bedroom closet, after which Ms. Loriaux

informed officers, who came and removed some of the carpeting from the closet. (*Id*. at 169-70.) Ms. Loriaux received a letter written by petitioner after his arrest asking for God's forgiveness and stating that he needed help. (Dkt. 6-7 at 24-25.)

A police officer testified about speaking with Ms. Loriaux and ascertaining the location in the closet where one of the incidents occurred. (Dkt. 6-6 at 189-190.) An officer subsequently cut out a part of the carpeting from the closet in EO's bedroom. (*Id*.) The police also obtained a DNA sample from petitioner. (Dkt. 6-7 at 4-5.)

The lead investigating officer testified that EO was taken to "Kids Talk," where she was interviewed by a forensic scientist. (Dkt. 6-6 at 178-79.) The officer and a protective services worker watched the interview from another room. (*Id*.) Neither the officer nor anyone else testified as to what EO said during the interview.

A forensic scientist with the Michigan State Police Crime Lab testified that sperm cells were found on the carpet sample, and that DNA analysis matched the cells with petitioner's known sample. (Dkt. 6-7 at 12-17.)

Petitioner testified in his own defense. He admitted that he wrote the letter that Ms. Loriaux found, (*id*. at 54, 63), and he admitted that he was the source of the semen found in the victim's closet. (*Id*. at 68.)

Petitioner explained that on the day Ms. Loriaux confronted him with the letter, he arrived home from work and looked for the letter but could not find it. (*Id*. at 54-55.) Ms. Loriaux was not home, and he thought she was at a store. (*Id*.) Petitioner took a shower and then caught EO watching a pornographic video, and EO told him, "Look, Dad, boo be doo." (*Id*. at 55.) He told her that she should not watch stuff like that, and he removed the DVD from the television. (*Id*. at 55-56.) Petitioner then became nervous, and he suspected that Ms. Loriaux found the letter. (*Id*. at 58.)

When Ms. Loriaux came home she confronted him with the letter, and she starting yelling, screaming, kicking, and smacking him. (*Id*. at 61-62.) Ms. Loriaux left the trailer, and the police subsequently arrived. (*Id*. at 63.)

Petitioner explained at trial why he wrote the letter:

It was something that had happened I believe it was Saturday morning this all happened on a Monday night I woke up that morning from because I had been having disturbing dreams for three and a half to four years. . . . But

I had had a very disturbing dream and I had woke up that morning and realized what time it was and saw that my son was going to be up in a minute wanting his first bottle of the morning.

I got up and was thinking about this dream and it's not the first time I've had disturbing dreams. I turned the baby monitor off went out into the living room and started making Rowan a bottle heard him wrestling and starting to crying I get the bottle grab him, feed him, after he had his bottle he gets sleepy eyes so I laid him back down.

So I laid him back down and I am thinking about these damn dreams. And it's a very disturbing the things that were involved in the dreams.

So like before I had these dreams I remember that I had marijuana out in the car. I went out to the car and decided to self-medicate I smoked a half joint behind the shed and it took care of the dreams I was thinking about the dreams that come up and it was okay for a minute but after that it was like something was in the weed never been so stoned before in my life and I've smoked weed before back in the day so but it wasn't normal.

And I went back into the house these thoughts about the dreams started to come back. I couldn't really control it.

Um I found myself writing in a notebook, um, vile despicable things you heard them and you knew that.

. . .

I needed to get them out of my head like I said like the pages of a little girl's diary not meant to be read it's more like therapeutic thing get it out of my head on get it on paper and be done with it well, hopefully.

(*Id*. at 63-65.)

8

With respect to the seminal fluid found in the closet, petitioner testified that he did not have an independent recollection of masturbating in EO's closet, but he remembered exiting the closet with semen on his hand. (*Id*. at 68.) Petitioner explained:

> Honestly, um it was suggested that I had been having like sleep withdrawals or sleep deprivation and I was having black outs yeah that why I called my wife before I come home from work because I wouldn't remember how I got home.

> Almost every day but I don't remember going into the closet. I only remember slow it down for you double darkness like nothing and then a big bright light and me stumbling out of that closet taking a step or two and stumbling over something else what I believe to be [EO] playing on the floor brushed her with my hand and stumbled again and turned around and she was there and she said something got on my shirt.

> And I was like what got on your shirt change your shirt. So after that I kind of tried to piece together maybe what happened.

> Because I looked at my hand and I had slimy stuff looked like semen and I went to the bathroom and went to the living room and saw my wife sleeping on the couch.

> It was probably still morning time. I don't know what was going on but I figured like [EO] caught me masturbating in her closet. I don't know how I got there though.

> So I grabbed some baby wipes and I went back into her room and she's just there playing like nothing happened and I'm like okay well she's not saying anything she's not looking at me weird or anything maybe she didn't see anything.

Anyway I go back to the closet and I notice something on the wall and the door and I take the baby wipes and wipe it off.

Um, also notice there was little bit on the carpet too and I wiped it off the carpet. If anything figuring that I don't know what just really happened.

You figure if I was if you know I was guilty of something horrific I would have went to the store and something because it happened a long time and brought a bottle of color safe bleach and put it on it.

But I didn't because I didn't figure anything happened and [EO] didn't say anything about what had happened so.

(*Id*. at 66-68.)

On cross-examination, petitioner was asked what "boo be doo" means, and he replied that it is "a sexual act in which a man places his penis in between the breast of a woman. . . ." (*Id*. at 76-77.) Petitioner admitted that the first part of his letter indeed referred to the cost of sending EO to Tennessee and back. (*Id*. at 77.)

Petitioner testified that he once thought of destroying the letter by burning it in the parking lot at work, but he didn't want to get into trouble for starting fires. (*Id*. at 81-82.) Petitioner explained that he never gave the letter to EO, but she must have read it when he gave her the notebook in which it was written after she asked for some paper. (*Id*. at 82.)

Following arguments and instructions, the jury found petitioner guilty of the charged offenses.

Following sentencing, petitioner's appellate counsel filed a motion for new trial, asserting his claims of ineffective assistance of counsel. The trial court denied the motion in a written opinion. (Dkt. 1 at 66-69.)

Petitioner then filed a brief on appeal, raising the following claims:

I. The trial court erred in denying defendant's motion for new trial where the testimony against him was weak, the People's key witness was impeached, and the case against Mr. Loriaux was marked by un[c]ertanties and discrepancies.

II. Defense trial counsel was ineffective within the meaning of the Sixth Amendment to the United States Constitution by failing to have the contentions of [E.O.] regarding criminal sexual conduct on defendant's part properly evaluated for credibility, accuracy and reliability, and the trial court erred in failing to grant a new trial on this ground.

III. Defense trial counsel was ineffective within the meaning of the Sixth Amendment to the United States Constitution by failing to contest the prosecution's motion in limine to exclude evidence relating to the prior abuse of the child complainant; failing to investigate the prior abuse of the child victim by her uncle; failing to engage in discovery regarding the prior abuse; and failing to request and conduct an in camera evidentiary hearing having as its objective a determination of relevancy of the evidence pertaining to the

prior molestation, so as to enable it to be used in defense of this action.

The Michigan Court of Appeals rejected petitioner's claims in an unpublished opinion. *People v. Loriaux*, Dkt. No. 312402, 2014 WL 1510100. Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the court. *People v. Loriaux*, 497 Mich. 889 (2014) (table).

## II.   Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); see also *Woods v. Etherton,* No. 15-723, 2016 WL 1278478, at *3 (U.S. Apr. 4, 2016) (habeas relief precluded if state court decision is "not beyond the realm of possibility [from what] a fairminded jurist could conclude.")

"Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a

condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

## III. Analysis

Both of petitioner's claims challenge the effectiveness of his trial counsel. His first claim asserts that his attorney should have challenged the prosecutor's motion to suppress evidence of a prior sexual assault committed against EO by her uncle. Petitioner argues that evidence of the victim's prior sexual assault was critical to the defense because it provided an explanation for her age-inappropriate knowledge of sex acts. Petitioner's second claim asserts his attorney was ineffective for failing to call an expert witness to challenge the credibility of the victim's testimony.

To establish a claim of ineffective assistance of counsel, Petitioner must show that "counsel's performance was deficient," and the "deficient performance prejudiced the defense." See *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The "deficient performance"

prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To determine whether Petitioner was prejudiced, the reviewing court must decide, based on the totality of the evidence before the fact-finder, whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must

be substantial, not just conceivable." *Harrington*, 562 U.S. at 86 (quoting *Strickland*, 466 U.S. at 693).

## A. Failure to Present Evidence of Prior Assault

The Court will first address petitioner's claim that his trial attorney was ineffective for failing to present testimony that the victim was previously sexually assaulted by her uncle to show the source of age-inappropriate knowledge of sex acts.

The Michigan Court of Appeals rejected the claim on the merits as follows:

> Defendant appears to contend that his counsel improperly interpreted the rape-shield statute, MCL 750.520j, to preclude evidence related to the prior sexual abuse of the child-victim in this case. Defendant claims that the rape-shield statute did not prohibit this evidence; rather, it was admissible to refute the inference that the child's apparently age-inappropriate sexual knowledge was acquired from defendant's alleged sexual conduct. Defendant appears to be correct that there are circumstances under which the prior sexual abuse of a child-witness may be admissible to rebut such an inference. See *People v. Morse*, 231 Mich. App. 424, 433–435; 586 N.W.2d 555 (1998), citing *People v. Hill*, 289 Ill. App. 3d 859, 862–865; 683 N.E.2d 188 (1997). In this case, the child's allegedly "age-inappropriate sexual knowledge" consisted primarily of her testimony that defendant forced her to "suck his dick" and her reference to defendant rubbing his penis between her breasts as the "boo be doo." However, in the letter that defendant wrote to the

child, he repeatedly referred to his penis as "dick," and repeatedly stated that she should "suck" his "dick." Further, when defendant was questioned as to what the unique phrase "boo be doo" meant, he readily explained its meaning which was consistent with the child's testimony. Consequently, any such prior sexual abuse by the child's uncle would not tend to explain the child's "age inappropriate sexual knowledge" or refute the inference that the child's knowledge was acquired from defendant's sexual conduct. Thus, defendant has neither established a relevant basis for the admission of evidence related to the prior sexual assault, nor that he was deprived of a substantial defense because of his attorney's failure to further investigate the prior abuse.

Further, an attorney's decisions regarding what evidence to present, what questions to ask witnesses, and whether to make an objection are presumed to be matters of sound trial strategy. *People v. Unger*, 278 Mich. App. 210, 242; 749 N.W.2d 272 (2008); *Davis*, 250 Mich.App. at 368. In this case, defendant has not overcome the presumption. It is likely defendant's attorney decided not to raise the issue of the prior sexual abuse committed against this child because it might tend to show that defendant was an opportunistic child predator who believed that this previously abused child-victim would not be believed or would be considered confused with regard to his sexually assaultive behavior. Defendant's attorney may have also believed that the admission of such evidence would have made the child appear to be more vulnerable or a more credible witness and defendant to be more heartless. Consequently, defendant failed to establish his ineffective assistance of counsel claim. Moreover, considering all of the evidence in this case,

including but not limited to the seminal fluid matching defendant's DNA on the carpet in the child's closet where the child testified she was forced to "suck his dick" until "white stuff" came out of it, as well as the letter that defendant wrote to the child which repeatedly referenced her "sucking his dick" and defendant's own testimony, defendant did not establish that any error related to evidence of the child's prior sexual abuse constituted plain error warranting appellate relief. See *Carines*, 460 Mich. at 763–764, 774.

*Loriaux*, 2014 WL 1510100, at *4.

Even assuming Michigan's rape shield law would have allowed for presentation of evidence of the prior sexual assault, the state court's conclusion that petitioner did not suffer prejudice was reasonable. At trial, though petitioner testified that he did not intend for her to read it, petitioner acknowledged that EO read his letter, which referred to the term for fellatio EO used at trial. Petitioner also testified at trial that he caught EO watching a pornographic video, and he heard her use the unusual phrase "boo be doo." That is, petitioner's defense—as provided by his own trial testimony—was that EO acquired age-inappropriate sexual knowledge by reading his letter and watching pornography.

But even setting that aside, petitioner cannot demonstrate a reasonable probability that the result of his trial would have been more favorable if the prior assault evidence had been admitted. The evidence

18

of petitioner's guilt was overwhelming, and his own testimony could easily have been disbelieved by the jury.

After the investigation was underway, EO recalled a particular sexual assault occurring in her bedroom closet, and she remembered that "white stuff" came out of petitioner and went onto the carpet. Subsequent forensic analysis corroborated the account when sperm cells matching Petitioner's DNA profile were found on a carpet sample. Petitioner's response to this physical evidence: he somehow unconsciously found his way into EO's closet where he also unconsciously masturbated, and when he regained awareness, he saw that EO was playing on the floor and semen was on her clothes.

And then there is petitioner's letter. Petitioner admitted that the money referred to in the letter related to the expense of sending EO to visit her grandmother. Thus, the demands and complaints about receiving oral sex as an expression of gratitude also referred to EO. The sex act referred to in the letter also corresponded to the sex act EO testified that she repeatedly performed on petitioner. Petitioner's response: he wrote the letter in a marijuana induced haze to rid himself of vile thoughts after having disturbing dreams.

Finally, there is the use of the unique term "boo be doo" by EO. The prosecutor best explained the term's impact on its case in closing argument:

> Well what does [EO] say he did? First she says he did the boo be doo with me. She described it. She had to lay down on the floor and he put his penis between her breast and rubbed himself.
>
> I asked him what does the boo be doo do? He knew exactly right away what it was and he described it for you this morning.
>
> Now it's really no wonder he's as an adult knows what this is but how does the child age nine know what the boo be doo is?
>
> And how does she know that what it is consistent with what he says it is? Because he taught her that. He did that to her.

(Dkt. 6-7 at 90-91.)

Simply put, the case against petitioner was strong, and petitioner's farfetched and implausible explanations for the incriminating evidence made it stronger. This was not a case of word-against-word as petitioner asserts. The victim's testimony that she performed oral sex on petitioner and that he rubbed his penis between her breasts was corroborated by the DNA evidence, the letter petitioner admitted he wrote, and the victim's use of a unique term for a sex act that petitioner used. The inclusion of evidence that EO was previously

sexually assaulted by her uncle would not have resulted in, with reasonable probability, a more favorable result. The claim is without merit.

## B. Failure to Present Expert Testimony

Petitioner's second claim of ineffective assistance of counsel asserts that his counsel failed to offer expert testimony to undermine the credibility of the victim. In support of this claim, Petitioner offers the affidavit of Dr. Daniel Swerdlow-Freed, a clinical and forensic psychologist. (Dkt. 1-1 at 48.)

In pertinent part, Swerdlow-Freed opines in his affidavit that the conversations between EO and adults following her initial allegations had the potential to taint her later accounts. Swerdlow-Freed detected inconsistencies and contradictions in EO's preliminary examination and trial testimony which he claims calls into question the reliability and accuracy of her story. He also states he would have been able to verify whether the forensic interviewer at Kids Talk followed the recommended protocol to avoid aversely influencing EO. Finally, Swerdlow-Freed states he could have provided testimony that leading,

suggestive, or coercive questioning can lead to fabrications or inaccuracies in a child's account of sexual abuse. (*Id*. at 48-58.)

The Michigan Court of Appeals denied the claim on the merits as follows:

> In support of his ineffective assistance of counsel claim premised on his attorney's failure to retain a qualified expert to investigate the child-victim's allegations and offer testimony in that regard, defendant refers to the "uncertainties, contradictions and conflicts" of the child's allegations and trial testimony. We disagree with defendant's characterizations of the child's allegations and testimony. She was a 10–year–old victim-witness attempting to testify in a public courtroom about a very difficult and embarrassing subject matter, i.e., being forced to suck her stepfather's penis on an almost daily basis, as well as other sexual assaults perpetrated against her. That she could not recall the exact days each assault occurred over the course of at least two years, what defendant or she were wearing during each assault, and the specific location of each separate assault does not constitute the type of "uncertainties, contradictions and conflicts" that warrant serious concerns about her credibility. In any case, the child's testimony was not the only evidence in this case. The evidence also included defendant's seminal fluid on the carpet in the closet where the child said she was made to suck defendant's penis, the letter defendant wrote to the child—which she testified defendant gave her to read—as discussed above, the letter defendant wrote to his wife admitting that he needed professional help, and the letter that he wrote to his parents saying that he was praying for

the opportunity to tell the child he was sorry. Further, defendant has not demonstrated that he was deprived a substantial defense by his counsel's failure to retain and present expert witness testimony. However, we agree with the trial court that, even if the failure to retain a qualified expert was not sound trial strategy, defendant has failed to establish that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different and the resultant proceedings were fundamentally unfair or unreliable. See *Brown*, 294 Mich. App. at 387–388. Thus, the trial court did not abuse its discretion when it denied defendant's motion for a new trial premised on this claim.

*Loriaux*, 2014 WL 1510100, at *3.

The conclusion by the state court that petitioner failed to establish a reasonable probability that the result of the trial would have been more favorable but for defense counsel's failure to call an expert witness did not involve an unreasonable application of the *Strickland* prejudice standard.

"It is well known in the literature . . . that the credibility of the child witness is often central to the success of child sex abuse prosecutions and that the circumstances surrounding the initial accusation of the abuse are important indicia of credibility." *Vasquez v. Bradshaw*, 345 F. App'x 104, 118 (6th Cir. 2009). Thus, petitioner's

"claim that his attorney failed to identify key evidence and failed to locate and interview critical witnesses is within the known contours of the duty" to conduct a reasonable pre-trial investigation. *Id.* at 115 (citing *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence"). "The circumstances ordinarily surrounding an accusation of child sexual abuse underscore this concern for developing impeachment evidence." *Id.* Indeed, this Court has granted habeas relief on account of a defense attorney's failure to present expert impeachment evidence in a child sexual assault case. *See Spaulding v. Larson*, 202 F. Supp. 3d 737 (E.D. Mich. 2016), *rev'd* No. 16-2261, 2017 WL 3328035 (6th Cir. Aug. 4, 2017).

But this case is readily distinguishable from cases like *Vasquez*. First, the prosecution here did not present any evidence regarding the consistency of EO's prior allegations. Nor did it present any expert testimony aimed at bolstering EO's credibility by referring to the victim's prior consistent accounts. In contrast, in *Vasquez* "[t]he state also offered testimony from [the victim's] father, Don Shaffer, the

investigating police officer, and the social worker who interviewed [the victim]. Their testimony tended to provide circumstantial evidence of her credibility: that her story remained consistent throughout the investigation and that she acted out of the ordinary, including being fearful for her safety and calling her father daily from school." *Id.,* 345 F. App'x at 106-107.

Here, in contrast, there was no prosecution expert testimony for Dr. Swerdlow-Freed to challenge. And there is reason to doubt that Dr. Swerdlow-Freed's own opinion regarding EO's credibility would have been admissible. *See*, *e.g.*, *People v. Chevis*, Dkt. No. 304358, 2013 WL 5539279, at *11 (Mich. Ct. App. Oct. 8, 2013) ("Had Dr. Swerdlow-Freed or a comparable expert been retained by defendant for trial and testified to credibility and improper influences, there may have been a basis to exclude the testimony as invading the province of the jury.").

Moreover, *Vasquez* involved a true word-against-word claim of sexual abuse. Here, in contrast, and as discussed in detail above, the prosecution's case was strongly supported by petitioner's letter, the DNA evidence, and the victim's knowledge of a unique sex term used by petitioner. In light of the strong evidence presented against petitioner,

the Michigan Court of Appeals' determination that "even if the failure to retain a qualified expert was not sound trial strategy, [petitioner] has failed to establish that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. . . ." is correct. *Loriaux*, 2014 WL 1510100, at *3. The claim is without merit.

## IV. Certificate of Appealability

In order to appeal the Court's decision, petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, jurists of reason would not debate the Court's conclusion that petitioner has not met the standard for a certificate of appealability because his claims are devoid of merit. The Court will therefore deny a certificate of appealability. The Court will also deny permission to appeal *in forma pauperis* because an appeal of this decision could not be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) DENIES WITH PREJUDICE the petition for a writ of habeas corpus, 2) DENIES a certificate of appealability, and 3) DENIES permission to appeal in forma pauperis.

IT IS SO ORDERED.

Dated: August 8, 2017           s/Judith E. Levy
Ann Arbor, Michigan         JUDITH E. LEVY
                            United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 8, 2017.

                            s/Shawna Burns
                            SHAWNA BURNS
                            Case Manager